IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| MARCUS MAXWELL, | § | |
| Institutional ID No. 00899656, | § | |
| SID No. 06204203 | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 1:18-CV-00179-BU |
| v. | § | |
| | § | |
| ROBERT ALMANZA, JR., *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
## OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff Marcus Maxwell, an inmate incarcerated by the Texas Department of Criminal Justice (TDCJ), brings this action under 42 U.S.C. § 1983 against various TDCJ employees. Dkt. No. 1. Two of these defendants—Major Robert Almanza, Jr., and Lieutenant Christopher Schmidt—have filed a Motion for Summary Judgment (Dkt. No. 196) seeking judgment on the basis of qualified immunity for Maxwell's Eighth Amendment claims alleging unconstitutional conditions of confinement and deliberate indifference to serious medical needs.

For reasons below, the undersigned RECOMMENDS that the Court DENY Defendants' Motion for Summary Judgment, Dkt. No. 196.

## I. JURISDICTION

Maxwell brings this action under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. § 1331. Venue is proper in the Abilene Division of

1

the Northern District of Texas because the events giving rise to Maxwell's claims occurred on or near Jones County, Texas. *See* Dkt. No. 24. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations (FCR) after Senior United States District Court Judge Sam R. Cummings transferred Maxwell's case to the undersigned for judicial screening under 28 U.S.C. §§ 1915, 1915A. Dkt. No. 6; 28 U.S.C. § 636(b)(1)(B).

## II.  FACTUAL BACKGROUND

On July 28, 2018, at approximately 11 a.m., Almanza accused Maxwell of a disciplinary violation and placed him in restraints. Dkt. No. 207 at 1. He then escorted Maxwell to the 10 Building at the Robertson Unit for a medical evaluation prior to being placed in a prehearing detention cell. *Id.* On the way to the 10 Building, Maxwell experienced symptoms of his asthma and laid down. *Id.* Around this time, Almanza told Maxwell that he was going to "force [him] to want to kill [him]self." *Id.*

Eventually, Maxwell arrived at medical and was evaluated. *Id.* at 2. Besides asthma, Maxwell also suffers from Stage 3 kidney failure. *Id.* at 3. Maxwell claims that Almanza was in the examination room while he discussed these medical conditions with a nurse. Dkt. No. 81 at 12.

Afterwards, Almanza escorted Maxwell to the 12 Building where Maxwell again laid on the ground complaining of asthmatic symptoms. Dkt. No. 207 at 2. Almanza told Maxwell to get up and that he "had something for [him]." *Id.* It was then that a five-man team arrived and used force to get Maxwell to comply with orders. *Id.*

Maxwell was then stripped naked[1] and placed in a psych observation cell, where he remained for the next "five to six days." Dkt. No. 81 at 9. The surfaces of Maxwell's cell were covered with blood and feces from a prior occupant. Dkt. No. 207 at 2. The cell was also empty except for a dual sink-toilet fixture that did not have running water. *Id.*

Maxwell claims that he went without any water or other liquid to drink until 4 p.m. on July 30—approximately 53 hours.[2] *Id.* at 3. During this time, Almanza visited Maxwell's cell twice, and both times Maxwell complained about the conditions inside his cell and his lack of drinking water. *Id.* Maxwell also attempted to explain to Almanza that the lack of water would exacerbate his kidney condition, but Almanza ignored his complaints and left without taking any action or providing water. *Id.*

Schmidt also visited Maxwell twice during the first 53 hours. *Id.* The first time was just several hours in, and again, Maxwell raised his concerns about the conditions inside the cell. *Id.* Schmidt responded that Maxwell "shouldn't have made them work" and "shouldn't have made them go through this." *Id.* Schmidt returned to Maxwell's cell at some point on July 29, during which Maxwell reiterated his concerns. *Id.* On both occasions, Schmidt left without addressing Maxwell's conditions. *Id.*

The lack of water eventually caused Maxwell to urinate blood sometime on July 29. *Id.* at 4. Soon after, he submitted a grievance explaining his situation. The next day, around noon, Maxwell asked for medical care. *Id.* Maxwell was then escorted to medical, where a

---

[1] Maxwell received a pair of boxers and pants approximately 24 hours after he was placed in the cell. Dkt. No. 81 at 17.

[2] Although he admits that he was brought food, Maxwell claims that he was not provided with any liquid during his meals. Dkt. Nos. 81 at 9–10; 207 at 3.

nurse examined him, gave him water, and attempted to have him moved to a different cell. *Id.* When efforts to get Maxwell moved were unsuccessful, the nurse called maintenance to have them fix his sink-toilet fixture and restore running water inside his cell. *Id.* Maxwell says that his cell was fixed no more than two hours later. *Id.* at 5.

When Maxwell returned to his cell, Almanza stopped by to ask what medical had said. *Id.* After Maxwell reported what had happened, Almanza walked away and came back with two cups of water, told Maxwell to drink, and laughed. *Id.*

## III.  THE PARTIES

Maxwell filed suit on November 2, 2018. Dkt. No. 1. Maxwell's action was transferred to the undersigned for screening, Dkt. No. 6, and Maxwell later consented to the undersigned exercising jurisdiction. Dkt. No. 7. The Court then held an evidentiary hearing under *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985), where Maxwell appeared via teleconference and testified under oath. Dkt. No. 30.

At the screening stage, the Court dismissed all of Maxwell's claims except his claim of unconstitutional conditions of confinement against Almanza, Schmidt, Carmen Walker LVN, and two John Doe defendants (unidentified officers) and claim of deliberate indifference to serious medical needs against Almanza and Walker.[3] Dkt. No. 34 at 2. Maxwell then appealed the dismissal of his claims, Dkt. No. 43, and the Court stayed Maxwell's case pending his appeal. Dkt. No. 62. The United States Court of Appeals for the Fifth Circuit affirmed the Court's judgment. Dkt. No. 189.

---

[3] Walker has answered, Dkt. No. 73, but efforts to identify the two John Doe defendants have proven unsuccessful and they have not appeared in this action.

Almanza and Schmidt now assert that they are entitled to qualified immunity and seek summary judgment on that basis. Dkt. No. 196.

## IV.  LEGAL STANDARDS

### A.     Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). The moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). Thus, the moving party must "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "[A] fact is 'material' if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citation and quotation marks omitted). A dispute is not

genuine if the facts being asserted are "blatantly contradicted by the record so that no reasonable jury could believe [them]." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court must consider materials cited by the parties, but it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 does not impose a duty on the Court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16, n.7 (5th Cir. 1992)).

"[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or [ ] a defendant . . . asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923–24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Once the movant has satisfied this burden, the burden shifts to the nonmovant to demonstrate that a genuine issue of material fact does exist and that the evidence, viewed in favor of the nonmovant, permits a jury verdict for the nonmovant. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). The nonmovant must "go beyond the pleadings" and produce evidence showing that there is a genuine issue of fact. *Celotex*, 477 U.S. at 324. However, the non-moving party cannot overcome its burden by merely alleging

6

legal conclusions or unsubstantiated assertions; instead, it must present affirmative evidence that supports the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

**B.    Qualified Immunity**

A governmental employee who is sued under § 1983 may assert the affirmative defense of qualified immunity. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). In deciding whether a defendant is entitled to qualified immunity, courts consider: "(1) [whether] the official violated a statutory or constitutional right, and (2) [whether] the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021).

# V.    ANALYSIS

The undersigned will first address whether the facts and reasonable inferences drawn in Maxwell's favor demonstrate a violation of his constitutional rights. Then, the undersigned will consider whether his rights, if violated, were clearly established at the time the violation occurred and whether Almanza and Schmidt's actions were objectively reasonable.

A.    **Construing the facts in Maxwell's favor, he has demonstrated that both Defendants violated his constitutional rights.**

The first prong of qualified immunity requires the plaintiff to allege and prove facts that establish a violation of their constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To state a claim under 42 U.S.C. § 1983, Maxwell must "allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010). Here, he alleges two claims under the Eighth Amendment: one for unconstitutional conditions of confinement against Almanza and Schmidt and the other for deliberate indifference to serious medical needs against Almanza. The undersigned will take each claim in turn.

### 1.    *Conditions of confinement*

"[T]he Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), however, nor does it "permit inhuman ones," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prisons have a duty to meet inmates' basic needs by furnishing adequate food, water, shelter, clothing, medical care, and a safe environment. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). Such basic needs constitute the "humane conditions of confinement" required under the Eighth Amendment. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001).

To prevail on a conditions-of-confinement claim, a plaintiff must plausibly state an objective and a subjective element. *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019). First, the plaintiff must establish that a prison official deprived him of the minimal

8

requirements for civilized measure of life's necessities, and thus objectively exposed him to a substantial risk of injury. *Id.* (citing *Farmer*, 511 U.S. at 834).

Although a single condition may satisfy this prong, a plaintiff may also show that multiple conditions in the aggregate deprived them of one of life's basic needs. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .") (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). Crucial as well is the length of time an inmate has been subjected to the condition. *See Hutto v Finney*, 437 U.S. 678, 686–87 (1978) ("A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months.").

Second, the plaintiff must demonstrate subjectively that the prison official knew that the inmate faced a substantial risk of serious harm and that the official "actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Id.* (citing *Farmer*, 511 U.S. at 842 n.8). More still, a plaintiff must then show that the official— despite being subjectively aware of a substantial risk of harm—"disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Finally, a prisoner must also show that the condition injured them in some way. *Coleman v. Dallas Cnty. Jail*, No. 3:19-cv-3009-L-BN, 2020 WL 7029915, at *4 (N.D. Tex. Oct. 22, 2020). Under the PLRA, "[n]o Federal civil action may be brought by a

9

prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e. The injury under a conditions of confinement claim must be "more than de minimis but need not be significant." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (cleaned up).

The evidence construed in Maxwell's favor easily satisfies the objective element. Water is undoubtedly one of life's necessities, and the deprivation of drinking water for more than two days obviously qualifies as a serious risk of harm. This would be true of any inmate, let alone one with a kidney condition.

While the lack of water alone is enough to establish the objective element, the other conditions Maxwell describes only bolster this conclusion. He asserts that for at least 53 hours and possibly up to six days, he lived in a cell without any form of bedding, was exposed to blood and feces without adequate access to sanitation measures such as running water, and was kept under constant illumination. Additionally, he spent the first 24 hours completely naked. Although these other conditions on their own—and perhaps even together—would more than likely fail to establish the objective element,[4] when combined with the lack of running water, they make it all the more clear that the conditions in Maxwell's cell created an objectively serious risk of harm. *See Gates*, 376 F.3d at 333. Moreover, Maxwell has shown that he suffered a physical injury for purposes of the PLRA due to his aggravated kidney condition.

---

[4] *See, e.g.*, *Desroche v. Strain*, 507 F. Supp. 2d 571, 578–81 (E.D. La. 2007).

Next, there is at least a genuine issue of material fact regarding whether Defendants were subjectively aware that the cell's conditions placed Maxwell at risk. Solely, focusing on the lack of water, Almanza and Schmidt each visited Maxwell's cell twice during the time he was without drinking water. And at each visit Maxwell explicitly emphasized that he did not have running water in his cell and was without any drinking water.

And construing the facts in Maxwell's favor, he has also carried his burden on the issue of whether Defendants were deliberately indifferent to the conditions inside his cell. Both times Almanza visited Maxwell's cell, he was confronted with Maxwell's complaints regarding the complete lack of water; however, he failed to acknowledge or address those concerns. Notably, too, the day Maxwell was placed in prehearing detention, Almanza had stated that he was going to "force [Maxwell] to want to kill [him]self." *Id.* Against this backdrop, a reasonable inference is that Almanza's lack of action was not mere aloofness, but a conscious and blatant disregard for Maxwell's wellbeing.

Schmidt's statements also create a fact issue for whether he displayed deliberate indifference. During Schmidt's first visit, he listened to Maxwell's concerns and purportedly told him that he "shouldn't have made them work" and "shouldn't have made them go through this." And like Almanza, Schmidt left both visits without taking any action to mitigate the conditions inside the cell.

Thus, the evidence viewed in Maxwell's favor and reasonable inference therefrom established a violation of Maxwell's rights under the Eighth Amendment.

### 2. *Deliberate indifference to serious medical needs*

Under the Eighth Amendment, prison officials must provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation regarding medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary and wanton infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (emphasis in original)).

"Deliberate indifference" means that the denial of medical treatment was "much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238 (5th Cir. 1985). In other words, "the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021)

To successfully claim a deliberate indifference to medical needs, a plaintiff must satisfy both an objective and subjective test. *Rogers*, 709 F.3d at 410. An inmate must first prove an objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of

serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107). "And, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Id.* (quoting *Farmer*, 511 U.S. at 838).

Once again, there can be little debate that a lack of adequate drinking water whilst suffering from Stage 3 kidney failure qualifies as an objective risk of serious harm. The complications Maxwell is alleged to have suffered due to the lack of water underscore this fact.

Less clear is whether Almanza was subjectively aware of this risk. In arguing that Almanza had the requisite awareness, Maxwell relies almost entirely on the fact that Almanza accompanied him to medical on July 28 and was present while Maxwell was examined by a nurse. Maxwell is adamant that his kidney issue was addressed at that examination, but it is unclear the extent to which it featured as the topic of conversation. Similarly, there is little evidence describing Almanza's attentiveness during this time. While it seems that Almanza was nearby and within earshot during Maxwell's conversation with the nurse, Maxwell offers no *definitive* evidence that Almanza was aware of his kidney condition

13

other than Maxwell's belief that Almanza was actively listening during this discussion. Further, while it may seem obvious to some that adequate hydration is especially important for those with kidney problems, the undersigned is hesitant to declare this as common knowledge such that a layperson would be aware of it.

Still, a reasonable inference in Maxwell's favor is that Almanza was paying attention during the July 28 examination and understood that Maxwell's conditions meant that he had a heightened need for adequate hydration.[5] Equipped with this awareness, Almanza's multiple failures to respond to Maxwell's repeated assertions that he was without water represent a deliberate indifference to serious medical needs.

### B.    Maxwell's rights were clearly established in 2018.

The second prong of qualified immunity necessitates that a plaintiff show that their constitutional right was clearly established at the time it was violated. A constitutional right is clearly established "only if 'the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violated that right.'" *Perniciaro*, 901 F.3d at 255 (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

---

[5] Almanza's response following Maxwell's visit to medical on July 30 casts some doubt on whether he was truly aware of Maxwell's condition and consciously disregarded it. Upon Maxwell's return from medical, Almanza asked him what medical had to say. After hearing about Maxwell's visit, Almanza immediately left the room to grab two cups of water and then gave them to Maxwell—although Maxwell claims that Almanza was laughing while doing so. If Almanza actually knew of Maxwell's medical needs prior to all this, it would seem odd for him to ask why Maxwell went to see medical, and only then exhibit a sense of concern for Maxwell's wellbeing. Perhaps this was a belated effort to avoid a charge of deliberate indifference, but it could also suggest that Almanza did not truly grasp Maxwell's predicament. In the end, though, this evidence signals a factual dispute for a jury to resolve.

14

Ordinarily, a right becomes clearly established when existing precedent has "placed the statutory or constitutional question beyond debate." *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017). A court must ensure that it does not "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. So, although the law does not require a case similar in every respect, clearly established law "must be particularized to the facts of the case." *Arzabala v. Weems*, No. 5:21-CV-00268-H, 2024 WL 1018530, at *5 (N.D. Tex. Mar. 8, 2024) (Hendrix, J.) (citing *White v. Pauly*, 580 U.S. 73, 79–80 (2017)). There are, though, rare instances where "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018); *see also Darden*, 880 F.3d at 727.

But even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

### 1.    *Water deprivation*

There is little doubt that every reasonable officer would recognize access to drinking water as one of life's necessities and that it implicates constitutional concern; however, the true question is whether it was clearly established in 2018 that going 53 hours without drinking water was an unconstitutional condition of confinement. The undersigned concludes that the law and nature of the condition and the associated risk meant every reasonable officer in 2018 would have concluded that 53 hours without any water was a violation of a clearly established right.

The quest to find cases similar to the one here is made difficult by the fact that in most reported cases where a prisoner alleges a period of inadequate hydration, the prisoner also received *some* fluids or at least had access to means of hydration. Even cases involving an inmate held inside a "dry cell"—*i.e.*, a cell lacking running water—are often distinguishable from the facts here because the inmates in those cases usually still receive something to drink during meals.[6]

The undersigned has yet to uncover a Fifth Circuit case specifying the length of time necessary for a deprivation of water to become unconstitutional. The undersigned has found only one case addressing a deprivation of drinking water. This unpublished case involved an inmate who went 27 hours without water after a water pipe burst at a jail but received "a carton of milk and cup of water" during this time. *Clark v. Harris*, 30 F.3d 1493, 1994 WL 398477, at *1 (5th Cir. 1994) (unpublished). The Court found that these facts did not rise above "mere discomfort of inconvenience." *Id.* (internal quotation marks omitted).

Looking outside the Fifth Circuit, though, it is apparent that an extended period without access to any means of hydration is unconstitutional and was clearly established

---

[6] There are many cases where inmates went even longer inside a "dry cell"—*i.e.*, a cell lacking running water—that held the conditions were not unconstitutional. Each of those cases, though, is distinguishable because, as just alluded to, the inmate had other means of hydration. *See, e.g.*, *Williams v. Delo*, 49 F.3d 442, 445–47 (8th Cir. 1995) (prisoner held in a cell without clothes, mattress, and running water for four days, but who was provided milk which he did not like to drink, did not show that the conditions violated the Eighth Amendment); *Collier v. Adams*, 602 F. App'x 850, 853 (3d Cir. 2015) (unpublished) (77 hours without running water in cell not unconstitutional when water was available in medical areas and milk was available at breakfast each day)

as such before 2018. The Third Circuit held in 2015 that a detainee's complete deprivation of water on two occasions—one for three days, the other two—were both unconstitutional. *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 228 (3d Cir. 2015); *see also Young v. Quinlan*, 960 F.2d 351, 364–65 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000). The Sixth Circuit in 2001 found three days without water was unconstitutional even when the inmate received two half pints of milk and one sixteen-and-one-half ounce bottle of water. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 512 (6th Cir. 2001). A year prior, the Ninth found allegations of inadequate drinking water over four days, along with other deprivations, sufficient to state an Eighth Amendment claim. *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000). And the Eleventh Circuit concluded in 2014: "[I]t would be abundantly clear to a reasonable officer that housing an inmate in a cell without potable water for at least several days would violate the inmate's constitutional rights." *Spires v. Paul*, 581 F. App'x 786, 794 (11th Cir. 2014) (unpublished). Courts have also found shorter deprivations unconstitutional when there was no justification for denying water. *See Barker v. Goodrich*, 649 F.3d 428, 436 (6th Cir. 2011) (discussing cases).

These cases are, of course, outside the Fifth Circuit, and none of them purport to set a bright line regarding how long the Constitution tolerates the deprivation of drinking water. Even so, the throughline is that a deprivation of water, without sufficient justification, is unconstitutional when it continues for an extended period of time. *United States v. Lanier*, 520 U.S. 259, 271 (1997) ("In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very

high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful") (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002).

The undersigned also finds that, even without these cases, the human body's fundamental need for water would have made it plainly obvious to a reasonable correctional officer that they could not sit idly by as an inmate went more than two days without any form of hydration. The Seventh Circuit suggested as much in *Hardeman v. Curran*:

> Wathen argues that despite the generally well-established nature of these rights, the circumstances of this case—a non-total deprivation caused by a three-day planned water shutdown—take us into novel territory. But what is so new about it? All but the most plainly incompetent jail officials would be aware that it is constitutionally unacceptable to fail to provide inmates with enough water for consumption and sanitation over a three-day period.

933 F.3d 816, 820 (7th Cir. 2019). Accordingly, the undersigned concludes that Defendants violated Maxwell's clearly established rights by subjecting him to more than two days without water to drink.

Nor can Defendants prevail still under the theory that their actions were objectively reasonable. There were no exigencies, such as a natural disaster or other emergency, that would excuse the total deprivation of water in this case. *See Clark*, 1994 WL 387477 at *1 (27 hours without potable water caused by burst pipe not unconstitutional); *Palomo v. Collier*, No. 2:23-CV-00037, 2023 WL 5610908, at *3 (S.D. Tex. Aug. 30, 2023) (collecting

cases), *appeal filed*, No. 23-40636 (5th Cir.). Under the circumstances alleged, the undersigned can think of no legitimate reason to deny Maxwell's requests for water, meaning Defendants' actions were eminently unreasonable.

For these reasons, the undersigned concludes that Defendants are not entitled to qualified immunity for Maxwell's claim alleging unconstitutional conditions of confinement.

### 2.    *Adequate medical care*

In *Easter v. Powell*, the Fifth Circuit held that the law was clearly established that a prisoner's rights are violated if "a prison official 'refuses to treat him, ignores his complaints, intentionally treats him incorrectly, or engages in any similar conduct that clearly evinces a wanton disregard for any serious medical needs.'" *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (cleaned up) (quoting *Domino*, 239 F.3d at 756).

The undersigned has already concluded that Almanza refused to treat Maxwell or simply ignored his complaints. Given *Easter*'s clarity, the undersigned also concludes that Almanza's actions violated a clearly established right. *See Sims v. Griffin*, 35 F.4th 945, 951–52 (5th Cir. 2022) (relying on *Easter* as demonstrating clearly established law); *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 309 (5th Cir. 2024) (same).

Finally, as already spelled out above, it was unreasonable for Almanza to do nothing in response to Maxwell's complaints that he needed water not just for basic human functioning but for a medical condition as well. It is often the case that a prisoner's medical needs may require a medical background or specialized equipment to treat—not so here. Other than rest, there is perhaps no treatment more simple than furnishing drinking water.

Even without medical education or training, Almanza was eminently qualified to supply Maxwell with the treatment he needed. His failure to do so was not reasonable.

Accordingly, Almanza is not entitled to qualified immunity on Maxwell's claim for deliberate indifference to serious medical needs.

## VI. CONCLUSION

For the reasons above, the undersigned concludes that Defendants are not entitled to qualified immunity. Thus, the undersigned RECOMMENDS that the Court DENY their Motion for Summary Judgment and enter a scheduling order to govern further proceedings.

## VII. RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VIII.  TRANSFER OF CASE

Because the parties have not consented to the undersigned exercising the full juris-diction of this Court, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the Senior United States District Judge and designated as Civil Action No. 1:18-CV-179-C.

ORDERED this 6th day of August 2024.

_____

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE